Levine v. Wyeth (2004-384)

2006 VT 107

[Filed 27-Oct-2006]



 NOTICE: This opinion is subject to motions for reargument under V.R.A.P.
 40 as well as formal revision before publication in the Vermont Reports. 
 Readers are requested to notify the Reporter of Decisions, Vermont Supreme
 Court, 109 State Street, Montpelier, Vermont 05609-0801 of any errors in
 order that corrections may be made before this opinion goes to press.


 2006 VT 107

 No. 2004-384


 Diana Levine Supreme Court

 On Appeal from
 v. Washington Superior Court


 Wyeth October Term, 2005


 Geoffrey W. Crawford, J.

 Richard I. Rubin and Kerry B. DeWolfe of Rubin, Kidney, Myer & DeWolfe,
 Barre, for Plaintiff-Appellee.

 Allan R. Keyes and R. Joseph O'Rourke of Ryan, Smith & Carbine, Ltd.,
 Rutland, and Bert W. Rein, Karyn K. Ablin and Sarah E. Botha of Wiley Rein
 & Fielding LLP, and Daniel S. Pariser of Arnold & Porter LLP, Washington,
 D.C., for Defendant-Appellant.


 PRESENT: Reiber, C.J., Dooley and Johnson, JJ., and Morris, D.J., and
 Allen, C.J. (Ret.), Specially Assigned

 
 ¶ 1. JOHNSON, J. Defendant Wyeth, a drug manufacturer, appeals
 from a jury verdict in favor of plaintiff Diana Levine, who suffered severe
 injury and the amputation of her arm as a result of being injected with
 defendant's drug Phenergan. Plaintiff claimed at trial that defendant was
 negligent and failed to provide adequate warnings of the known dangers of
 injecting Phenergan directly into a patient's vein. Defendant argues that
 the trial court should not have allowed the jury to consider plaintiff's
 claims because the claims conflict with defendant's obligations under
 federal law regulating prescription drug labels. We hold that there is no
 conflict between state and federal law that requires preemption of
 plaintiff's claim. Defendant also raises two claims of error relating to
 the jury instructions on damages. We hold that the court's rulings on
 these jury instructions were correct, and we affirm. 

 ¶ 2. In April 2000, plaintiff was injected with defendant's drug
 Phenergan at Northeast Washington County Community Health, Inc. ("the
 Health Center"). The drug was administered to treat plaintiff's nausea
 resulting from a migraine headache. Plaintiff received two injections. 
 The drug was first administered by intramuscular injection. Later the same
 day, when plaintiff's nausea continued, she received a second dose by a
 direct intravenous injection into her arm, using a procedure known as "IV
 push." The second injection resulted in an inadvertent injection of
 Phenergan into an artery. As a result, the artery was severely damaged,
 causing gangrene. After several weeks of deterioration, plaintiff's hand
 and forearm were amputated. 
 
 ¶ 3. Plaintiff brought a superior court action for negligence
 and failure-to-warn product liability, alleging that defendant's inadequate
 warning of the known dangers of direct intravenous injection of Phenergan
 caused her injuries. During a five-day jury trial, both parties presented
 expert testimony regarding the adequacy of the warnings defendant placed on
 Phenergan's label. Plaintiff's experts testified that the label should not
 have allowed IV push as a means of administration, as it was safer to use
 other available options, such as intramuscular injection or administration
 through the tubing of a hanging IV bag. Defendant's expert testified that
 allowing IV push with instructions cautioning against inadvertent arterial
 injection was sufficient. The court instructed the jurors that they could
 consider the FDA's approval of the label in use at the time of plaintiff's
 injury, but that the label's compliance with FDA requirements did not
 establish the adequacy of the warning or prevent defendant from adding to
 or strengthening the warning on the label. At the conclusion of the trial,
 the jury found in favor of plaintiff on both the negligence and
 product-liability claims and awarded her $2.4 million in economic damages
 and $5 million in non-economic damages. Pursuant to the parties'
 stipulation, this award was reduced to a total of $6,774,000 to account for
 pre-judgment interest and plaintiff's recovery in a settlement of a
 separate action she had filed against the Health Center. 
 
 ¶ 4. In a summary judgment motion prior to trial, as well as in
 its timely motion for judgment as a matter of law following trial, both of
 which the superior court denied, defendant argued that federal law
 preempted plaintiff's claim. These arguments rested in part on defendant's
 contention that it had submitted an adequate warning to the FDA, but that
 the FDA rejected the change because it did not favor strengthening the
 warning.(FN1) Plaintiff contended that neither warning would have been
 adequate. The trial court stated, in its decision on defendant's motion
 for judgment as a matter of law, that although the FDA had rejected a new
 warning, the agency's "brief comment" failed to explain its reasoning or
 demonstrate that it "gave more than passing attention to the issue of
 whether to use an IV infusion to administer the drug. The proposed
 labeling change did not address the use of a free-flowing IV bag." The
 court concluded that there was "no basis for federal preemption" and upheld
 the jury's verdict. 
 
 ¶ 5. Defendant claims the superior court erred by: (1) failing
 to dismiss plaintiff's claim on the basis that the Food and Drug
 Administration's approval of the Phenergan label preempted state common law
 claims that the label was inadequate; (2) failing to instruct the jury to
 reduce plaintiff's damages by the amount of fault attributable to the
 Health Center; and (3) failing to instruct the jury to calculate the
 present value of plaintiff's damages for future non-economic losses. We
 reject these claims of error, and we affirm.
 
 I. Federal Preemption
 
 ¶ 6. Defendant's principal argument on appeal is that the court
 should have dismissed plaintiff's claim because it was preempted by federal
 law. Defendant asserts that any state common law duty to provide a
 stronger warning about the dangers of administering Phenergan by IV push
 conflicts with the FDA's approval of the drug's label. As preemption is a
 question of law, we review the trial court's decision de novo. Office of
 Child Support v. Sholan, 172 Vt. 619, 620, 782 A.2d 1199, 1202 (2001)
 (mem.). We hold that the jury's verdict against defendant did not conflict
 with the FDA's labeling requirements for Phenergan because defendant could
 have warned against IV-push administration without prior FDA approval, and
 because federal labeling requirements create a floor, not a ceiling, for
 state regulation.

 ¶ 7. The United States Constitution provides that federal law is
 the supreme law of the land. U.S. Const. art. VI, cl. 2. The Supremacy
 Clause is the basis for the doctrine of preemption, according to which
 "state law that conflicts with federal law is 'without effect.' " Cipollone
 v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (quoting Maryland v.
 Louisiana, 451 U.S. 725, 746 (1981)). In Cipollone, the Court described
 the relevant analysis for determining whether Congress intended a federal
 statute to preempt state law:


 Congress' intent may be explicitly stated in the statute's
 language or implicitly contained in its structure and
 purpose. In the absence of an express congressional command,
 state law is pre-empted if that law actually conflicts with
 federal law, or if federal law so thoroughly occupies a
 legislative field as to make reasonable the inference that
 Congress left no room for the States to supplement it.

 Id. (quotations and citations omitted). Absent clear congressional intent
 to supersede state law, including state common law duties, there is a
 presumption against preemption. Medtronic, Inc. v. Lohr, 518 U.S. 470, 485
 (1996) ("[B]ecause the States are independent sovereigns in our federal
 system, we have long presumed that Congress does not cavalierly pre-empt
 state-law causes of action."); Cipollone, 505 U.S. at 516 ("Consideration
 of issues arising under the Supremacy Clause 'start[s] with the assumption
 that the historic police powers of the States [are] not to be superseded by
 . . . Federal Act unless that [is] the clear and manifest purpose of
 Congress.' " (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230
 (1947))). This presumption has "add[ed] force" when there has been a "long
 history of tort litigation" in the area of state common law at issue. 
 Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005).
 
 ¶ 8. Defendant concedes that Congress has not expressly
 preempted state tort actions through the Food, Drug and Cosmetics Act
 (FDCA), 21 U.S.C. ¶¶ 301-399, and that Congress did not intend the FDCA
 to occupy the entire field of prescription drug regulation. Rather, it
 asserts that plaintiff's action "actually conflicts with federal law." 
 Cipollone, 505 U.S. at 516. This requires defendant to show either that
 "it is impossible for a private party to comply with both state and federal
 requirements," or that Vermont's common law "stands as an obstacle to the
 accomplishment and execution of the full purposes and objectives of
 Congress." Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)
 (quotations and citations omitted).

 ¶ 9. Defendant presents two alternative bases for its assertion
 of conflict preemption: (1) in the specific context of the Phenergan label,
 the FDA was aware of the dangers of IV-push administration and specifically
 ordered defendant to use the warning it used, making it impossible for
 defendant to comply with both its state common-law duty and the
 requirements of federal law; and (2) by penalizing drug companies for using
 FDA-approved wording on drug labels, state tort claims like plaintiff's
 present an obstacle to the purpose of the FDA's labeling regulations. 
 Before reaching these issues, we briefly examine the FDA's role in
 regulating prescription drug labels and the general approach courts have
 taken to the preemptive effect of federal labeling requirements.

 A. Regulatory Background
 
 ¶ 10. Prior to distributing a prescription drug such as
 Phenergan, the manufacturer must submit a New Drug Application (NDA) for
 FDA approval. 21 U.S.C. ¶ 355(a). The FDA must approve the application
 unless it fails to meet certain criteria, including whether test results
 and other information establish that the drug is "safe for use under the
 conditions prescribed, recommended, or suggested in the proposed labeling
 thereof," whether there is "substantial evidence that the drug will have
 the effect it purports or is represented to have under the conditions of
 use prescribed, recommended, or suggested in the proposed labeling
 thereof," and whether, "based on a fair evaluation of all material facts,
 such labeling is false or misleading in any particular." Id. ¶ 355(d).

 ¶ 11. "FDA regulations mandate the general format and content of
 all sections of labels for all prescription drugs as well as the risk
 information each section must contain," and "[f]inal approval of the NDA is
 'conditioned upon the applicant incorporating the specified labeling
 changes exactly as directed, and upon the applicant submitting to FDA a
 copy of the final printed label prior to marketing.' " McNellis v. Pfizer,
 Inc., 2005 WL 3752269, at *4 (D.N.J.) (citing 21 C.F.R. ¶¶ 201.56,
 201.57, and quoting 21 C.F.R. ¶ 314.105(b)). Once a drug and its label
 have been approved, any changes to the label ordinarily require submission
 and FDA approval of a "Supplemental NDA." 
 Id.; 21 C.F.R. ¶ 314.70(b)(2)(v)(A).

 ¶ 12. If the NDA process and the submission of changes for FDA
 approval were the exclusive means of creating and altering prescription
 drug labels, this might be a very different case. A key FDA regulation,
 however, allows a drug's manufacturer to alter the drug's label without
 prior FDA approval when necessary. The regulation provides in relevant
 part:


 (6) The agency may designate a category of changes for the
 purpose of providing that, in the case of a change in such
 category, the holder of an approved application may commence
 distribution of the drug product involved upon receipt by the
 agency of a supplement for the change. These changes
 include, but are not limited to:

 . . . . 

 (iii) Changes in the labeling . . . to accomplish any of the
 following: 

 (A) To add or strengthen a contraindication, warning,
 precaution, or adverse reaction;

 . . . . 

 (B) To add or strengthen an instruction about dosage and
 administration that is intended to increase the safe use of
 the drug product[.]

 21 C.F.R. ¶ 314.70(c). 

 ¶ 13. Section 314.70(c) creates a specific procedure allowing
 drug manufacturers to change labels that are insufficient to protect
 consumers, despite their approval by the FDA. "The FDA's approved label .
 . . can therefore be said to set the minimum labeling requirement, and not
 necessarily the ultimate label where a manufacturer improves the label to
 promote greater safety." McNellis, 2005 WL 3752269, at *5. While specific
 federal labeling requirements and state common-law duties might otherwise
 leave drug manufacturers with conflicting obligations, ¶ 314.70(c) allows
 manufacturers to avoid state failure-to-warn claims without violating
 federal law. Id. ("[I]t is apparent that prior FDA approval need not be
 obtained, nor will a product be deemed mislabeled, if the manufacturer
 voluntarily or even unilaterally strengthens the approved warnings,
 precautions or potential adverse reactions upon the label pursuant to 21
 C.F.R. ¶ 314.70(c)(6)(iii)(A)."). There is thus no conflict between
 federal labeling requirements and state failure-to-warn claims. Section
 314.70(c) allows, and arguably encourages, manufacturers to add and
 strengthen warnings that, despite FDA approval, are insufficient to protect
 consumers. State tort claims simply give these manufacturers a concrete
 incentive to take this action as quickly as possible. 

 B. Conflict Preemption in Other Jurisdictions
 
 ¶ 14. In light of the leeway created by ¶ 314.70(c) for drug
 manufacturers to add warnings, courts have been nearly unanimous in holding
 that state failure-to-warn tort claims do not conflict with federal law. 
 See, e.g., McNellis, 2005 WL 3752269, at *7 ("[T]he FDCA and the FDA's
 regulations do not conflict with New Jersey's failure to warn law because
 those federal regulations merely set minimum standards with which
 manufacturers must comply."). McNellis is the latest in a series of recent
 cases addressing this issue as it relates to the anti-depressant Zoloft,
 which allegedly increases the risk of suicide in some patients. See id.,
 at *7-8 (denying summary judgment and rejecting conflict preemption in
 Zoloft case); accord Zikis v. Pfizer, Inc., 2005 WL 1126909, at *2-3 (N.D.
 Ill.); Witczak v. Pfizer, Inc., 377 F. Supp. 2d 726, 729-30 (D. Minn.
 2005); Motus v. Pfizer, Inc., 127 F. Supp. 2d 1085, 1096-1100 (C.D. Cal.
 2000); see also Cartwright v. Pfizer, Inc., 369 F. Supp. 2d 876, 882 (E.D.
 Tex. 2005) ("With little exception, courts that have considered this exact
 issue have concluded that state failure to warn claims are not preempted by
 the FDCA and its attendant regulations."). Contra Needleman v. Pfizer,
 Inc., 2004 WL 1773697, at *1 (N.D. Tex.) (granting summary judgment to the
 defendant on basis of conflict preemption). 

 ¶ 15. The Zoloft cases are representative of a general rule that
 FDA approval of a drug's label does not preempt state failure-to-warn
 claims. See, e.g., Eve v. Sandoz Pharm. Corp., 2002 WL 181972, at *1-3
 (S.D. Ind.) (rejecting conflict preemption of failure-to-warn claim
 regarding the drug Parlodel); Caraker v. Sandoz Pharm. Corp., 172 F. Supp.
 2d 1018, 1032 (S.D. Ill. 2001) (same); Bryant v. Hoffman-La Roche, Inc.,
 585 S.E.2d 723, 725 (Ga. Ct. App. 2003) (heart medication); Bell v. Lollar,
 791 N.E.2d 849, 854-55 (Ind. Ct. App. 2003) (prescription pain medication);
 Kurer v. Parke, Davis & Co., 2004 WI App 74, 21, 679 N.W.2d 867 (oral
 contraceptive). But see Ehlis v. Shire Richwood, Inc., 233 F. Supp. 2d
 1189, 1198 (D.N.D. 2002) (granting summary judgment to defendant on basis
 of conflict preemption of claim regarding the drug Adderall).
 
 ¶ 16. Defendant cites two cases, Needleman and Ehlis, that
 support the preemptive effect of the FDCA in failure-to-warn cases
 regarding prescription drug labels. Needleman, 2004 WL 1773697, at *1;
 Ehlis, 233 F. Supp. 2d at 1198. Needleman is not particularly helpful
 under the circumstances here. Its holding relied on the facts of the
 Zoloft litigation, particularly an FDA statement that the warning advocated
 by the plaintiff would have been misleading. 2004 WL 1773697, at *1. The
 courts in the other Zoloft cases took a different approach to the FDA's
 statement, in part because the FDA's statement was not "an official agency
 position," and in part because the FDA later retracted its position
 regarding the link between Zoloft and suicide. See, e.g., Witczak, 377 F.
 Supp. 2d at 730. Here, the FDA has not indicated that a stronger warning
 would be misleading, so the reasoning of Needleman appears inapplicable to
 this case. Ehlis interpreted ¶ 314.70(c) as allowing unapproved changes
 to a label only temporarily, and only under "limited circumstances." 233
 F. Supp. 2d at 1197-98. We can find no support for this interpretation in
 the language of the regulation, which appears to allow unilateral changes
 to drug labels whenever the manufacturer believes it will make the product
 safer, and places no limit on the duration of pre-approval warnings unless
 the FDA disapproves of the change. 21 C.F.R. ¶ 314.70(c).

 ¶ 17. Defendant next attempts to draw a comparison to the
 regulation of medical devices under the FDCA, citing medical device cases
 in which state tort law has been preempted. See Buckman Co. v. Plaintiffs'
 Legal Comm., 531 U.S. 341, 348 (2001) (holding that "fraud-on-the-FDA"
 claim relating to device regulated by Medical Device Amendments to FDCA was
 preempted); Horn v. Thoratec Corp., 376 F.3d 163, 177 (3d Cir. 2004)
 (holding that failure-to-warn claim was preempted by Medical Device
 Amendments). We find this analogy unpersuasive. Neither Buckman nor Horn
 weakens the force of the drug-labeling cases cited above. The claim that
 was preempted in Buckman was for "fraud on the FDA," not failure to warn;
 the Court held that the presumption against preemption applies only when a
 claim implicates " 'the historic primacy of state regulation of health and
 safety,' " which is not the case when the claim arises from a federal
 statute. 531 U.S. at 347-48 (quoting Medtronic, 518 U.S. at 485). 
 Plaintiff's negligence and product-liability claims fall squarely within
 the scope of traditional state regulation, so it is appropriate to apply
 the presumption against preemption here. In Horn, the Third Circuit
 relied on an express preemption clause in the FDCA that relates only to
 medical devices. 376 F.3d at 176. Because no such clause exists for
 prescription drugs, Horn's reasoning does not apply to this case.
 
 ¶ 18. Finally, defendant cites a third group of cases relating
 generally to the United States Supreme Court's recent use of conflict
 preemption in other fields. This argument relies primarily on Geier v.
 American Honda Motor Co., 529 U.S. 861 (2000). In Geier, the Court held
 that state tort claims based on the production of automobiles without
 airbags conflicted with federal regulations making airbags one of several
 permissible safety equipment options. 529 U.S. at 881. Geier, however,
 rested on the conclusion that the Department of Transportation's intent in
 drafting the regulation at issue was to provide a range of different safety
 options, thus precluding any state determination that a specific type of
 equipment should be required. Id. The history of the regulation at issue
 indicated that the agency intended to phase in automobile safety
 requirements gradually, allowing the public to choose between mandatory
 seatbelt laws at the state level and a federal passive-restraint
 requirement. Id. at 880-81. Allowing state tort claims based on the lack
 of a particular safety mechanism would have conflicted with both the
 agency's phase-in plan and its intent to provide consumers with a range of
 safety options. Id. at 881. The Court explicitly stated that in a
 different context, an agency could promulgate regulations that provided a
 floor, but not a ceiling, for state regulation. Id. at 870. 

 ¶ 19. The FDA's labeling requirements are exactly that type of
 regulation. Section 314.70(c) does not allow us to interpret FDA approval
 of a drug label as anything but a first step in the process of warning
 consumers. When further warnings become necessary, the manufacturer is at
 least partially responsible for taking additional action, and if it fails
 to do so, it cannot rely on the FDA's continued approval of its labels as a
 shield against state tort liability. While a state common-law duty may
 encourage departure from a label that the FDA has approved in great detail,
 such a duty does not create a conflict with federal requirements because
 the FDA and the state share the purpose of encouraging pharmaceutical
 companies to alter their drug labels when they are inadequate to protect
 consumers. We agree with the significant majority of courts that state
 failure-to-warn claims are generally not preempted by federal labeling
 requirements.
 
 ¶ 20. We must now apply this reasoning to defendant's two
 original contentions: (1) notwithstanding the fact that it is generally
 possible for manufacturers to comply with both federal and state law
 through the procedures created by ¶ 314.70(c), the FDA's specific actions
 with respect to Phenergan made it impossible for defendant to comply with
 both federal and state law; and (2) even if plaintiff's claim and the cases
 cited above do not make it impossible for manufacturers to comply with both
 state and federal law, they present an obstacle to federal objectives. 

 C. Impossibility of Compliance

 ¶ 21. Defendant contends that in this case, it was impossible to
 comply with both state and federal law because the FDA prohibited the use
 of a stronger warning with respect to IV-push administration of Phenergan. 
 This claim is not supported by the evidence defendant presented to the
 trial court. The record lacks any evidence that the FDA was concerned that
 a stronger warning was not supported by the facts, that such a stronger
 warning would distract doctors from other provisions in the drug's label,
 or that the warning might lead to less effective administration of the
 drug. Instead, defendant essentially relies on two factual assertions: 1)
 the FDA approved the label that was in use in 2000; and 2) the FDA, in
 reviewing the label for use in a different version of Phenergan, expressed
 its opinion of the adequacy of the warning in the original label by
 stating, "Retain verbiage in current label." AB 5, 5 n.7 
 
 ¶ 22. With respect to defendant's first assertion, our analysis
 above demonstrates that FDA approval of a particular label does not preempt
 a jury finding that the label provided insufficient warning, as defendant
 was free under ¶ 314.70(c) to strengthen the warning without prior FDA
 approval. Defendant's second assertion depends on the meaning of the
 instruction, "[r]etain verbiage in current label." Tort liability for
 defendant's failure to strengthen its warning could have created a direct
 conflict requiring federal preemption only if the FDA intended the
 instruction to prohibit any language strengthening the original warning. 
 In other words, unless we interpret the FDA's statement as evidence that it
 would have rejected any attempt by defendant to strengthen its label
 through ¶ 314.70(c), we cannot conclude that it was impossible for
 defendant to comply with its state common-law duty without violating
 federal law. 
 
 ¶ 23. Defendant argues that the instruction reflected the FDA's
 opinion not only that a stronger warning was unnecessary, but also that it
 would have harmed patients by eliminating IV push as an option for
 administering Phenergan. The record does not support this interpretation. 
 Defendant has provided a number of letters exchanged by the FDA and
 defendant regarding Phenergan's label, but these letters do not indicate
 the FDA's opinion of the value of IV-push administration. Neither the
 letters nor any other evidence presented to the jury indicated that the FDA
 wished to preserve the use of IV push as a method of administering
 Phenergan. Nor can we infer such concern from the agency's instruction to
 "[r]etain current verbiage" instead of adopting the proposed warning. The
 specific warning the agency rejected in favor of the original label did not
 indicate any more clearly than the original label that IV-push
 administration was unsafe, which is what plaintiff argued made the original
 label inadequate. The FDA could have rejected the new warning for any
 number of reasons, including clarity or technical accuracy, without
 implicitly prohibiting a stronger warning. Defendant's unsupported
 hypothesis that the FDA saw the new warning as harmful seems among the
 least likely explanations, as the rejected proposal would not have
 eliminated IV push as an option for administering Phenergan.(FN2) With
 respect to IV administration, the original label read, "When administering
 any irritant drug intravenously it is usually preferable to inject it
 through the tubing of an intravenous infusion set that is known to be
 functioning satisfactorily," while the proposed label stated, "[i]njection
 through a properly running intravenous infusion may enhance the possibility
 of detecting arterial placement. In addition, this results in delivery of
 a lower concentration of any arteriolar irritant." See supra 4 n.1
 (comparing proposed and original warnings). Simply stated, the proposed
 warning was different, but not stronger. It was also no longer or more
 prominent than the original warning, so it could not have raised a concern
 that it might overshadow other warnings on the label or drive doctors away
 from prescribing the drug. There is no evidence that the FDA intended to
 prohibit defendant from strengthening the Phenergan label pursuant to ¶ 
 314.70(c).(FN3) Thus, we cannot conclude that it was impossible for
 defendant to comply with its obligations under both state and federal law.
 
 D. Obstacle to Congressional Purposes and Objectives

 ¶ 24. Defendant next contends that state common-law liability
 for its use of an FDA-approved label presents an obstacle to federal
 objectives. We hold that plaintiff's claim does not interfere with any
 objective that can legitimately be ascribed to Congress. We agree with the
 reasoning in the cases cited above, supra 14-15, that federal labeling
 requirements pursuant to the FDCA create a floor, not a ceiling, for state
 regulation. Defendant presents a new FDA rule containing language
 disputing this reasoning, but this statement does not alter our conclusion
 that there is no conflict between federal objectives and Vermont common
 law.

 1. The Purposes and Objectives of Congress
 
 ¶ 25. In the absence of a conflict that makes it impossible for
 a regulated entity to comply with both state and federal law, federal law
 will preempt state law only if it "stands as an obstacle to the
 accomplishment and execution of the full purposes and objectives of
 Congress." Freightliner, 514 U.S. at 287 (quotations omitted). We must
 therefore examine what "the full purposes and objectives of Congress" were
 with respect to federal labeling requirements for prescription drugs. We
 agree with the McNellis court that a system under which "federal
 regulations merely set minimum standards with which manufacturers must
 comply" is 

 fully consistent with Congress' primary goal in enacting the
 FDCA, which is "to protect consumers from dangerous
 products," United States v. Sullivan, 332 U.S. 689, 696
 (1948), as well as Congress' stated intent that the FDCA "
 'must not weaken the existing laws,' but on the contrary 'it
 must strengthen and extend that law's protection of the
 consumer.' " United States v. Dotterweich, 320 U.S. 277[,
 282] (1943) [quoting S. Rep. No. 152, 75th Cong., 1st Sess.,
 p. 1].

 2005 WL 3752269, at *7; see also Witczak, 377 F. Supp. 2d at 731 ("Congress
 certainly did not intend to bar drug companies from protecting the public
 when enacting the FDCA; its goal was to protect the public. . . . Any
 contrary interpretation of Congress's intent is perverse.").

 ¶ 26. In fact, Congress has expressed its purposes clearly, not
 only in the general sense that the statute was intended to "protect the
 public," but also more specifically, with respect to the FDCA's preemptive
 effect. In the 1962 amendments to the FDCA, Congress included a clause
 expressly limiting the preemptive effect of the statute: "Nothing in the
 amendments made by this Act to the Federal Food, Drug, and Cosmetic Act
 shall be construed as invalidating any provision of State law . . . unless
 there is a direct and positive conflict between such amendments and such
 provision of State law." Drug Amendments of 1962 (Harris Kefauver Act),
 Pub. L. No. 87 781, ¶ 202, 76 Stat. 780, 793 (1962).
 
 ¶ 27. This amendment essentially removes from our consideration
 the question of whether common-law tort claims present an obstacle to the
 purposes and objectives of Congress. Congress intended that the FDCA would
 leave state law in place except where it created a "direct and positive
 conflict" between state and federal law. Drug Amendments ¶ 202. This
 language "simply restates the principle that state law is superseded in
 cases of an actual conflict with federal law such that 'compliance with
 both federal and state regulations is a physical impossibility.' " See S.
 Blasting Servs., Inc. v. Wilkes County, 288 F.3d 584, 591 (4th Cir. 2002)
 (interpreting "direct and positive conflict" language in the preemption
 clause of a federal statute governing explosive materials to allow states
 to "impose more stringent requirements than those contained in the federal
 regulations") (quoting Hillsborough County v. Automated Med. Labs., Inc.,
 471 U.S. 707, 713 (1985)).(FN4) In other words, under any circumstances
 where it is possible to comply with both state law and the FDCA, the state
 law in question is consistent with the purposes and objectives of Congress. 
 Thus, our discussion above regarding defendant's impossibility argument,
 supra 21-23, provides a complete answer to the question of preemption.

 ¶ 28. We recognize that our dissenting colleague has reached the
 opposite conclusion. There is little to say, beyond what we have already
 said, except that we respectfully disagree with his analysis of the FDCA,
 the FDA's regulations, and the specific context of this lawsuit. Numerous
 courts have concluded, over the course of decades, that the FDCA provides a
 floor, not a ceiling, for state regulation. See supra, 14-15. While the
 dissent cites favorably the minority view, we agree with the majority view. 
 There is much to be said for the policy arguments employed by courts
 adopting this minority view, including the argument that permitting too
 much state activity in this area will make beneficial drugs less available
 to consumers. Similarly, there is merit to the majority perspective that
 eliminating lawsuits like the one at issue here would leave consumers
 without recourse in the event the FDA cannot move quickly enough to require
 strengthened warnings when they are appropriate. Our view is that neither
 policy argument is relevant here. The plain language of the statute
 indicates that Congress did not intend to interfere with state prerogatives
 except where doing so is absolutely necessary, see supra, 25-27, and the
 plain language of the regulation makes such interference unnecessary here,
 see supra, 12-13. This analysis is consistent with the constitutionally
 rooted presumption against preemption. To look more broadly at arguments
 relying on assumptions about safety and economic efficiency is to apply the
 opposite presumption-the presumption that Congress could not possibly have
 intended to allow states to intrude on what seems, intuitively, to be an
 area of federal expertise. It is neither our responsibility, nor that of
 the FDA, to question the policy judgments of Congress. The litigation at
 issue here does not pose a direct and positive conflict with federal law,
 and thus, there is no basis for federal preemption. 

 2. The FDA's New Statement on Preemption
 
 ¶ 29. Defendant, after oral argument in this case, cited a new
 FDA regulation that contains a statement relating to the preemptive effect
 of the FDCA. The substance of the regulation changes certain aspects of
 labeling requirements for prescription drugs, but these changes are
 irrelevant to this appeal because the new rule did not take effect until
 June 2006. Food and Drug Administration, Requirements on Content and
 Format of Labeling for Human Prescription Drug and Biological Products,
 Supplementary Information, 71 Fed. Reg. 3922, 3922 (Jan. 24, 2006). The
 rule's "Supplementary Information" section, however, contains a broad
 statement regarding the preemption of state common-law failure-to-warn
 claims. Id. at 3933-36. In this statement, the FDA asserts that recent
 cases rejecting preemption of these claims, including those cited above,
 pose an obstacle to the agency's enforcement of the labeling requirements. 
 Id. Among the interpretations the agency claims are incorrect are: (1)
 those rejecting preemption on the basis of ¶ 314.70(c); and (2) those
 stating that federal labeling requirements are minimum standards and that
 "[s]tate law serves as an appropriate source of supplementary safety
 regulation for drugs by encouraging or requiring manufacturers to
 disseminate risk information beyond that required by FDA under the act." 
 Id. at 3934.
 
 ¶ 30. We are ordinarily required to defer to an agency's
 interpretation of a statute it administers. Chevron, U.S.A., Inc. v.
 Natural Res. Def. Council, 467 U.S. 837, 844 (1984) ("We have long
 recognized that considerable weight should be accorded to an executive
 department's construction of a statutory scheme it is entrusted to
 administer . . . ."). Plaintiff, however, urges us not to defer to the
 FDA's statement because it "was adopted without the requisite comment
 period" and "lack[s] the force of law." Presumably, if we were to credit
 plaintiff's argument, we would owe the statement only the limited deference
 due to agency statements made outside the agency's rulemaking authority. 
 See United States v. Mead Corp., 533 U.S. 218, 226-27 (2001) (stating that
 Chevron deference applies only "when it appears that Congress delegated
 authority to the agency generally to make rules carrying the force of law,
 and that the agency interpretation claiming deference was promulgated in
 the exercise of that authority"). We need not decide this difficult
 question of administrative law, however, because we conclude that
 irrespective of the level of deference we might apply, the statement would
 not affect the outcome of this appeal.

 ¶ 31. Under Chevron, deference to an agency's interpretation is
 appropriate only when a statute is "silent or ambiguous with respect to the
 specific issue" the agency has considered; otherwise, "the court, as well
 as the agency, must give effect to the unambiguously expressed intent of
 Congress." 467 U.S. at 842-43. Moreover, "[t]he judiciary is the final
 authority on issues of statutory construction and must reject
 administrative constructions which are contrary to clear congressional
 intent." Id. at 843 n.9. "If a court, employing traditional tools of
 statutory construction, ascertains that Congress had an intention on the
 precise question at issue, that intention is the law and must be given
 effect." Id. When an agency's interpretation is not the type of
 interpretation entitled to Chevron deference, we must still grant it some
 respect, but only "a respect proportional to its 'power to persuade.' "
 Mead, 533 U.S. at 235 (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140
 (1944)).
 
 ¶ 32. Under either standard, the FDA's statement deserves no
 deference. We have already concluded, supra 26-27, that Congress intended
 the FDCA to preempt only those state laws that would make it impossible for
 manufacturers to comply with both federal and state requirements. Nothing
 in the FDA's new statement alters our conclusion that it would be possible
 for defendant to comply with both its federal obligations and the
 obligations of state common law. The regulatory framework for prescription
 drug labeling allows drug manufacturers to add or strengthen a warning "to
 increase the safe use of the drug product" without prior FDA approval. See
 supra 10-13 (citing 21 C.F.R. ¶ 314.70(c)(6)(iii)(C)). Even if the new
 rule eliminated or altered this provision, the change in the regulation did
 not take effect until June 2006.(FN5) Without such a change, it is possible
 for manufacturers to comply with both FDA regulations and duties imposed by
 state common law, and there is no "direct and positive conflict" between
 state and federal law.

 ¶ 33. The FDA does not attempt to establish such a conflict or
 explain the inconsistency between its position and the language of the
 preemption amendment. The statement cites the amendment, but then proceeds
 as if Congress had not spoken on the issue of preemption. The agency
 relies on Geier to support its disregard of Congress's "direct and positive
 conflict" language, asserting that "[t]he existence of a legislative
 provision addressing pre-emption does not bar the operation of ordinary
 principles of implied preemption." 71 Fed. Reg. at 3935 (citing Geier, 529
 U.S. at 869). Geier does state that implied preemption applies even when a
 statute addresses preemption expressly, 521 U.S. at 869, but it does not
 allow courts or agencies to preempt state laws that have been expressly
 preserved by Congress. Instead, it simply stands for the proposition that
 Congress's intent not to preempt a provision of state law cannot be
 inferred from either (1) an express preemption clause that does not include
 the state law in question in its scope, or (2) a clause that prevents
 regulated entities from using compliance with federal law as a defense in
 state common-law suits. Id. at 869-70. According to Geier, the former
 clause does not support a negative inference that Congress must have
 intended to preserve laws it did not expressly preempt; the latter
 indicates only that Congress intended to preserve some common-law claims,
 not that it intended to allow even claims that conflict with federal
 requirements. Id. But see id. at 870 (stating that even the latter clause
 would "preserve[] those actions that seek to establish greater safety than
 the minimum safety achieved by a federal regulation intended to provide a
 floor"). 
 
 ¶ 34. Here, we are not attempting to infer the effect of
 statutory language that only indirectly addresses the specific state law at
 issue. Instead, we are interpreting an unambiguous express preemption
 clause that specifically preserves the type of state law at issue. Under
 these circumstances, ordinary preemption principles must give way to
 Congress's intent to preserve state laws that do not create a "direct and
 positive conflict" with federal law. Drug Amendments ¶ 202. There is no
 such conflict here. Accordingly, the FDA's statement is neither an
 authoritative interpretation of an ambiguous statutory provision entitled
 to deference, Chevron, 467 U.S. at 842-43, nor a persuasive policy
 statement entitled to respect. Mead, 533 U.S. at 235. Plaintiff's claim
 does not impose conflicting obligations on defendant or present an obstacle
 to the objectives of Congress. We therefore agree with the trial court
 that the claim is not preempted by federal law.

 II. Apportionment of Damages

 ¶ 35. Defendant next contends the court erred by failing to
 instruct the jury to reduce plaintiff's damages by the amount of fault
 attributable to the Health Center. "Reversing a jury verdict based on
 allegedly faulty jury instructions is warranted where the party claiming
 error establishes that the instructions were erroneous and prejudicial." 
 Simpson v. Rood, 2005 VT 21, 5, 178 Vt. 474, 872 A.2d 306 (mem.). We hold
 that there was no error in the court's failure to require apportionment of
 damages between defendant and the Health Center.
 
 ¶ 36. Defendant argues that pursuant to Vermont's comparative
 negligence statute, a defendant is liable for only the portion of the
 plaintiff's damages attributable directly to that defendant's negligence. 
 12 V.S.A. ¶ 1036. Our traditional rule is that multiple tortfeasors are
 jointly and severally liable. See Zaleskie v. Joyce, 133 Vt. 150, 158, 333
 A.2d 110, 115 (1975) ("[T]he law of this state . . . permits a plaintiff to
 pursue all, or any part, of his recovery from either joint tortfeasor"). 
 According to defendant, ¶ 1036 applies not only under circumstances where
 comparative negligence is alleged on the part of the plaintiff, and not
 only when multiple defendants are sued in the same action, but also any
 time the plaintiff recovers from someone besides the defendant. Thus,
 because plaintiff and the Health Center reached a settlement in a separate
 lawsuit related to the same injury, defendant claims the jury should have
 been required to calculate the Health Center's proportion of causal
 negligence and subtract that percentage from the verdict. 

 ¶ 37. Section 1036 states, under the heading of "Comparative
 negligence,"

 Contributory negligence shall not bar recovery in an action
 by any plaintiff, or his legal representative, to recover
 damages for negligence resulting in death, personal injury or
 property damage, if the negligence was not greater than the
 causal total negligence of the defendant or defendants, but
 the damage shall be diminished by general verdict in
 proportion to the amount of negligence attributed to the
 plaintiff. Where recovery is allowed against more than one
 defendant, each defendant shall be liable for that proportion
 of the total dollar amount awarded as damages in the ratio of
 the amount of his causal negligence to the amount of causal
 negligence attributed to all defendants against whom recovery
 is allowed.
 
 12 V.S.A. ¶ 1036. We interpreted this statute under slightly different
 circumstances in Plante v. Johnson, 152 Vt. 270, 565 A.2d 1346 (1989). In
 Plante, the defendant resisted joinder of the plaintiffs' claims against
 her and a third party, resulting in a joint trial with two separate
 verdicts. The jury first returned a verdict against the third party for
 the entire amount of the plaintiff's damages, then found against the
 defendant for the same amount, and the court consolidated the judgments. 
 The defendant appealed, arguing that the first verdict made the third
 party's share of the fault 100%. She concluded that under ¶ 1036, she
 was entitled to a ruling apportioning 100% of the liability for the
 plaintiff's damages to the third party. The defendant failed to argue this
 point at trial, making a holding regarding ¶ 1036 unnecessary. We
 nevertheless examined the statute in depth to demonstrate that our
 determination that the defendant was not entitled to apportionment was
 "more than a technical omission." Id. at 272, 565 A.2d at 1347. We
 concluded that the statute did not apply to the defendant in Plante because
 "the statute provides for apportionment among defendants, suggesting that
 only those joined in the same action should be considered in apportioning
 damages," and "there is no allegation that the plaintiff was negligent in
 this case."(FN6) Id. at 273, 565 A.2d at 1347-48. 

 ¶ 38. In reaching this conclusion, we relied in part on the fact
 that "the New Hampshire Supreme Court has held that its nearly identical
 statute does not apply to create several liability in the absence of an
 allegation of negligence on the part of the plaintiff." Id., 565 A.2d at
 1348 (citing Lavoie v. Hollinracke, 513 A.2d 316, 319-20 (N.H. 1986)). 
 Defendant points out that Lavoie has since been overruled, but the decision
 overruling it, Nilsson v. Bierman, 839 A.2d 25 (N.H. 2003), relied on a
 legislative revision of New Hampshire's statute that placed the concepts of
 comparative negligence and apportionment under separate headings. Id. at
 29. In the absence of action by the Legislature to amend Vermont's
 comparative negligence statute, we see no reason to depart from the
 interpretation of ¶ 1036 contained in Plante. The Health Center was not
 a party to plaintiff's action against defendant, and defendant does not
 allege that plaintiff was comparatively negligent, so ¶ 1036 does not
 apply in this case.
 
 ¶ 39. Defendant argues that whether or not ¶ 1036 applies, we
 can depart from our common law and determine that joint and several
 liability should no longer prevent apportionment among joint tortfeasors
 when one tortfeasor has settled in a previous action. We decline to do so. 
 In Howard v. Spafford, 132 Vt. 434, 321 A.2d 74 (1974), which also involved
 an interpretation of ¶ 1036, we expressed our hesitation to depart from
 the rule precluding contribution among joint tortfeasors, preferring not to
 "substitute judicial fiat for legislative action." Id. at 435, 321 A.2d at
 75. Among the many reasons cited in Howard for adhering to the common law
 was the sheer number of alternative schemes adopted by other states. Id.
 at 436-37, 321 A.2d at 75-76. This reasoning applies here as well. Our
 choice is not between the traditional rule and a uniform new rule, but
 rather between a traditional rule and a number of potential new rules or
 combinations of rules. The Nilsson court pointed out the divide among
 states requiring jury verdicts to be reduced by the dollar amount of the
 plaintiff's settlement with a third party (pro tanto), those requiring
 verdicts to be reduced by the percentage of the settling party's fault
 (proportional share), and those requiring verdicts to be divided among all
 joint tortfeasors equally (pro rata). 839 A.2d 30-31. That court pointed
 out that while "[t]he American Law Institute favors the proportional share
 approach . . . , the overwhelming majority of States reject the
 proportional share approach in favor of some version of the pro tanto
 approach," and New Hampshire's legislature chose a combination of the two. 
 Id. at 31 (citations and quotations omitted). It is important to note that
 if we were to adopt the majority rule, our decision would have no effect on
 this case, as plaintiff and defendant have stipulated to a pro tanto
 reduction. Like the New Hampshire court, we will allow the Legislature to
 determine which approach is best, if it has not done so already by leaving
 ¶ 1036 in place after our interpretation in Plante.

 III. Present Value of Damages

 ¶ 40. Finally, defendant contends the court erred by failing to
 instruct the jury to calculate the present value of plaintiff's damages for
 future non-economic losses, such as pain and suffering. Defendant claims
 that the jury's verdict, which granted plaintiff $5 million in non-economic
 damages, exceeded the present value of plaintiff's requested amount by
 $856,073. In rejecting defendant's proposed instruction, the court pointed
 out that defendant failed to provide the jury with expert guidance as to
 how present value should be calculated, and that "[j]udges and lawyers are
 universally incapable of performing the discount calculations with or
 without a calculator and the tables of historic interest rates and
 inflationary factors." We agree that it would have been inappropriate to
 instruct the jury to make such a calculation under these circumstances.
 
 ¶ 41. Even if defendant had presented testimony allowing the
 jury to make an informed calculation, we would have upheld the jury's
 verdict for several reasons. First, defendant's assertion that the jury
 did not take account of the present value of plaintiff's non-economic
 damages is pure speculation, as plaintiff's calculation of her economic
 damages was presented in terms of its present value, and "the jury was not
 required to demonstrate its calculations" with respect to plaintiff's
 non-economic damages. Debus v. Grand Union Stores of Vt., 159 Vt. 537,
 543, 621 A.2d 1288, 1292 (1993). Second, we limit pre-judgment interest to
 economic damages because non-economic damages are "inchoate and rarely
 ascertainable at the time of injury." Turcotte v. Estate of LaRose, 153
 Vt. 196, 200 n.2, 569 A.2d 1086, 1088 n.2 (1989). These damages become no
 less inchoate following a judgment, and we will not require juries to apply
 a precise economic calculation to a figure we have identified as inherently
 imprecise. 
 
 ¶ 42. Finally, most jurisdictions and the Restatement (Second)
 of Torts reject the concept of requiring juries to make present-value
 calculations with respect to non-economic damages. See, e.g., Taylor v.
 Denver & Rio Grande W. R.R., 438 F.2d 351, 353 (10th Cir. 1971) (holding
 that instruction requiring present-value reduction for pain and suffering
 was error and stating that most courts that have considered the issue have
 decided "that the better reasoned authority supports the rule that future
 pain and suffering should not be reduced to current worth"); Restatement
 (Second) of Torts ¶ 913A cmt. a (1979) (stating that while future
 pecuniary losses should be reduced to present value, "an award for future
 pain and suffering or for emotional distress is not discounted in this
 fashion"). But see Olivieri v. Delta S.S. Lines, Inc., 849 F.2d 742,
 750-51 (2d Cir. 1988) (stating that "[i]f we were writing on a clean slate,
 we might be inclined to accept the view of the other circuits and reject
 any discounting of future non pecuniary losses," but previous Second
 Circuit holdings required such discounting in some form). Defendant's
 reliance on our decision in Parker v. Roberts, 99 Vt. 219, 131 A.2d 21
 (1925), is misplaced, as Parker, while it required a jury instruction on
 the present value of future losses, did not address the distinction between
 pecuniary and non-pecuniary losses. Id. at 224-25, 131 A.2d at 23. The
 trial court did not err in refusing to instruct the jury to reduce
 plaintiff's non-economic damages to present value.

 Affirmed.

 ___________________________________
 Associate Justice


------------------------------------------------------------------------------
 Dissenting


 ¶ 43. REIBER, C.J., dissenting. The overarching issue in this
 appeal is whether plaintiff's common-law claim for failure to warn
 conflicts with the FDA's regulation of Phenergan, the drug responsible for
 plaintiff's injuries. I would conclude that the jury's verdict in this
 case conflicts with federal law for two reasons.

 ¶ 44. First, it would be impossible for defendant Wyeth to
 comply with the requirements of both state and federal law. Specifically,
 the FDA approved IV administration of Phenergan and required that IV
 administration be listed on the Phenergan label. By contrast, plaintiff's
 theory of the case required Wyeth either to remove this approved use from
 the Phenergan label, add a warning that would directly contradict the
 label's indication that IV administration was a safe and effective use, or,
 at a minimum, add a warning that only certain types of IV administration
 should be used. Thus, compliance with state law in this case would require
 Wyeth to eliminate uses of Phenergan approved by the FDA and required to be
 included in the Phenergan labeling.
 
 ¶ 45. Second, plaintiff's state-law claim conflicts with federal
 law in that it poses an obstacle to federal purposes and objectives. In
 short, by approving Phenergan for marketing and distribution, the FDA
 concluded that the drug-with its approved methods of administration and as
 labeled-was both safe and effective. See 21 U.S.C. ¶ 355(d) (listing
 criteria for drug approval). In finding defendant liable for failure to
 warn, a Vermont jury concluded that the same drug-with its approved methods
 of administration and as labeled-was "unreasonably dangerous." See Town of
 Bridport v. Sterling Clark Lurton Corp., 166 Vt. 304, 308, 693 A.2d 701,
 704 (1997) (to succeed on failure-to-warn claim, plaintiff must show that
 "failure to warn made the product unreasonably dangerous and therefore
 defective"). These two conclusions are in direct conflict.

 ¶ 46. For both of these reasons I would conclude that the
 state-law cause of action is preempted. I respectfully dissent.
 
 I. Impossibility of Compliance

 ¶ 47. As explained by the majority, because there is no clause
 in the FDCA expressly preempting state law, Wyeth must demonstrate that
 preemption is implied by showing either that federal law thoroughly
 occupies the regulatory field (a claim that Wyeth does not advance) or that
 there is an actual conflict between state and federal law. Actual
 conflict, in turn, can be demonstrated in one of two ways: by showing that
 it is impossible for the regulated party to comply with both state and
 federal law or that state law "stands as an obstacle to the accomplishment
 and execution of the full purposes and objectives of Congress." 
 Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995) (quotations
 omitted).

 ¶ 48. The majority in essence concludes that it is not
 impossible for Wyeth to comply with both federal and state standards
 because Wyeth never sought FDA approval of a "stronger warning" of the type
 advocated by plaintiff. According to the majority, because the FDA was not
 presented with, and therefore did not explicitly reject, such strengthened
 language, there is no reason to presume that the FDA would disapprove. 
 Therefore, the majority reasons, there is no actual conflict between state
 and federal law. See ante ¶ 21-22. It is inaccurate, however, to
 characterize the requirements imposed by the jury verdict in this case as
 merely requiring a "stronger warning." Rather, what plaintiff sought was
 an elimination of a use of Phenergan that had been approved by the FDA. 
 Furthermore, the FDA's rejection of Wyeth's efforts to alter the language
 of the warning in 2000 supports Wyeth's claim that the FDA had an
 affirmative preference for the language of the original warning.

 A.
 
 ¶ 49. The crux of plaintiff's claim was not based on the label
 warnings per se, but on the approved uses listed there. See, e.g., ante ¶ 3
 ("Plaintiff's experts testified that the label should not have allowed IV
 push as a means of administration . . .."). A review of plaintiff's
 complaint and the evidence presented at trial makes clear that the standard
 plaintiff sought to establish (i.e., the change to the label that would be
 required in light of the jury's finding of liability) was to remove IV
 administration-or at least certain types-as an approved use. For example,
 plaintiff's complaint asserted that the warnings on the label were
 inadequate and that: 

 [t]he Phenergan sold by defendant is . . . NOT REASONABLY
 SAFE FOR INTRAVENOUS ADMINISTRATION because the foreseeable
 risks of harm posed by intravenous administration of the drug
 are sufficiently great in relation to its foreseeable
 theraputic benefits that reasonable health care providers,
 knowing of such foreseeable risks and benefits, WOULD NOT
 PRESCRIBE THE DRUG INTRAVENOUSLY FOR ANY CLASS OF PATIENTS."

 (Emphasis added.) In her appellate brief, plaintiff characterizes the
 evidence as revealing "that Wyeth was aware of research indicating that
 DIRECT IV ADMINISTRATION OF PHENERGAN WAS UNSAFE." (Emphasis added.) 
 Plaintiff further refers to expert testimony "that the LABEL SHOULD HAVE
 RESTRICTED PHENERGAN TO INTRAMUSCULAR INJECTIOn as this method of
 administration presents no risk of inadvertent arterial injection; or,
 alternatively, that if IV administration is used, it must be by injecting
 the Phenergan into a hanging IV bag, not through a direct IV." (Emphasis
 added.)
 
 ¶ 50. Here, the FDA clearly addressed the risks attending IV
 administration of the drug. The label approved IV administration generally,
 and specifically warned of the dangers of direct IV administration,
 including inadvertent arterial injection possibly resulting in amputation. 
 In light of this, it cannot be argued that the FDA did not (1) assess the
 risk of IV administration, including direct IV administration and the
 associated risk of amputation due to inadvertent arterial injection; (2)
 conclude that the benefits of allowing IV administration with appropriate
 warnings outweighed the risk; and (3) reach a decision regarding precisely
 what warning language should be used. These assessments are, in fact, the
 very essence of the FDA's approval and are in furtherance of the federal
 objective of advancing public health by balancing the risks and benefits of
 new drugs and facilitating their optimal use. See 21 U.S.C. ¶ 355(d)
 (listing factors to be considered in approving or refusing new drug
 application); 21 U.S.C. ¶ 393(b)(1), (b)(2)(B) (FDA is charged with
 promoting public health by acting promptly on new drug applications and
 protecting public health by ensuring that new drugs are both safe and
 effective).

 ¶ 51. The majority reconciles this manifest conflict by relying
 on 21 C.F.R. ¶ 314.70(c), which allows a drug manufacturer to alter a
 label "[t]o add or strengthen a contraindication, warning, precaution, or
 adverse reaction" or "add or strengthen an instruction about dosage and
 administration" prior to FDA approval.(FN7) On this basis, the majority
 concludes that Wyeth "was free under ¶ 314.70(c) to strengthen the
 warning without prior FDA approval." Ante ¶ 22. But, it is an
 overstatement to claim that manufacturers are "free" to change drug labels
 under ¶ 314.70(c). To the contrary, a manufacturer may change a label
 only to add or strengthen a warning, not to eliminate an approved use, as
 plaintiff would require here. In other words, what plaintiff advocates is
 not a stronger warning but language that would directly contradict language
 approved and mandated by the FDA.
 
 ¶ 52. Further, the apparent purpose of ¶ 314.70(c) is to allow
 manufacturers to address newly-discovered risks. See 44 Fed. Reg. 37434,
 37447 (June 26, 1979) (allowing supplement to label "whenever possibly
 harmful adverse effects associated with the use of the drug are
 discovered"). Even courts that conclude that ¶ 314.70(c) provides
 manufacturers broad latitude to add warnings to labels acknowledge that
 such supplements are aimed at previously unknown and unanalyzed risks. See
 McNellis v. Pfizer, Inc., 2005 WL 3752269, at *6 (D.N.J.) (concluding that
 ¶ 314.70(c) "was promulgated precisely to allow drug manufacturers to
 quickly strengthen label warnings when evidence of new side effects [is]
 discovered") (citing 30 Fed. Reg. 993 (Jan. 20, 1965)); Kurer v. Parke,
 Davis & Co., 2004 WI App 74, 18, 679 N.W.2d 867 (noting that, under ¶ 
 314.70(c), "[d]rug manufacturers can strengthen warnings or petition for
 additional warnings when new risk information arises"). Another section of
 the regulation makes clear that any changes to a label that exceed the
 scope of ¶ 314.70(c) are considered "major changes" that require prior
 approval before the drug may be distributed. ¶ 314.70(b), (b)(2)(v). In
 short, the regulation does not allow manufacturers to simply reassess and
 draw different conclusions regarding the same risks and benefits already
 balanced by the FDA. Here, the FDA had already evaluated the risk of
 inadvertent arterial injection from direct IV administration of Phenergan,
 and had mandated warning language for the label to reflect that risk
 assessment.

 ¶ 53. In addition, any change accomplished under ¶ 314.70(c)
 is subject to ultimate FDA review and approval. See ¶ 314.70(c)(7)
 (providing that FDA may order manufacturer to cease distribution of drug if
 it disapproves supplemental application); see also Needleman v. Pfizer,
 Inc., 2004 WL 1773697, at *3 (N.D. Tex. 2004) (noting that changes to label
 under ¶ 314.70(c) are temporary and "must later be approved by the FDA"). 
 Thus, any additional or different warnings must ultimately be supported by
 scientific research that meets the FDA's standards. Neither a
 manufacturer, a state court, nor a state legislature can permanently
 substitute its judgment of the risk-benefit analysis for that of the FDA.
 
 ¶ 54. At its core, plaintiff's argument in this case was not
 that the warnings on the label were inadequate, but that an approved use
 (direct IV administration) was in fact unreasonably unsafe. Plaintiff did
 not seek to "add or strengthen" a warning or a dosage/administration
 instruction, but rather to eliminate an approved use of the drug. This is
 a disagreement that cannot be overcome by operation of ¶ 314.70(c). 
 Plaintiff's claim in this case-that a method of administration of the drug
 should be partially if not entirely eliminated from the labeling-represents
 a substantive disagreement with FDA policy that goes beyond
 labeling/warning issues alone. This disagreement creates opposing
 requirements and a manufacturer could not satisfy both at once.

 B.

 ¶ 55. Wyeth argues that even if ¶ 314.70(c) theoretically
 allows a manufacturer to make unilateral changes to a drug label, in this
 case, the FDA actually rejected Wyeth's attempts in 2000 to change the
 warning regarding intra-arterial injection and amputation. The trial court
 concluded that the FDA gave only "passing attention" to the risks of IV
 administration in 2000. Ante ¶ 4. The majority similarly concludes that
 the record does not indicate "that the FDA wished to preserve the use of IV
 push as a method of administering Phenergan." Ante ¶ 23. I cannot agree
 with this assessment of the record.

 ¶ 56. Both the original label and Wyeth's proposed alternative
 were titled "INADVERTENT INTRA-ARTERIAL INJECTION." On the original label,
 the first two sentences of the warning read:

 Due to the close proximity of arteries and veins in the areas
 most commonly used for intravenous injection, extreme care
 should be exercised to avoid perivascular extravasation or
 inadvertent intra-arterial injection. Reports compatible
 with inadvertent intra-arterial injection of [Phenergan],
 usually in conjunction with other drugs intended for
 intravenous use, suggest that pain, severe chemical
 irritation, severe spasm of distal vessels, and resultant
 gangrene requiring amputation are likely under such
 circumstances.

 On the proposed label, the first sentence of the warning read: "There are
 reports of necrosis leading to gangrene, requiring amputation, following
 injection of [Phenergan], usually in conjunction with other drugs; the
 intravenous route was intended in these cases, but arterial or partial
 arterial placement of the needle is now suspect." While the proposed
 change to the warning language may not reflect what plaintiff would require
 in a warning, it cannot be disputed that Wyeth's proposed alternative
 warning (1) placed greater emphasis on the risk of necrosis and amputation
 by referencing it in the first sentence, and (2) gave the FDA the
 opportunity to consider the specific, alternative warning advanced by
 Wyeth, as well as the adequacy of the warning in general. Despite this
 opportunity, the FDA mandated that Wyeth retain the language of the
 existing warning. The alleged extent of the FDA's consideration of the
 issue is not relevant, in my view.

 ¶ 57. In 2000, the FDA confirmed its assessment that health care
 professionals should be permitted to choose IV administration in its
 various forms as a means of delivering the drug, where appropriate. Wyeth
 could not both list all forms of IV administration as an approved use, as
 required by the FDA, and exclude all or some forms of IV administration as
 unsafe, as required by the jury's verdict in this case. It would be
 impossible to comply with both requirements.

 II. Obstacle to Federal Purposes and Objectives

 ¶ 58. I would further conclude that Wyeth has demonstrated
 actual conflict preemption by showing that plaintiff's state-law
 failure-to-warn claim poses an obstacle to federal purposes and objectives.
 The majority does not address this issue, concluding that Wyeth does not
 have the option of proving this form of actual conflict preemption. The
 majority reaches this conclusion by relying on the following clause in the
 1962 amendments to the FDCA: 

 Nothing in the Amendments made by this Act to the Federal
 Food, Drug, and Cosmetic Act shall be construed as
 invalidating any provision of State law . . . unless there is
 a direct and positive conflict between such amendments and
 such provision of state law.

 Ante ¶ 26 (quoting Drug Amendments of 1962 (Harris Kefauver Act), Pub. L.
 No. 87 781, ¶ 202, 76 Stat. 780, 793 (1962)). Citing Southern Blasting
 Services, Inc. v. Wilkes County, 288 F.3d 584, 591 (4th Cir. 2002), the
 majority concludes that the provision "essentially removes from our
 consideration the question of whether common-law tort claims present an
 obstacle to the purposes and objectives of Congress," because the 1962
 provision "simply restates the principle that state law is superseded in
 cases of actual conflict with federal law such that compliance with both
 federal and state regulations is a physical impossibility." Ante ¶ 27
 (internal quotations omitted). "In other words," the majority explains,
 "under any circumstances where it is possible to comply with both state law
 and the FDCA, the state law in question is consistent with the purposes and
 objectives of Congress." Id. Thus, the majority eliminates the
 possibility of proving actual conflict preemption independently through the
 "obstacle" prong of that standard.

 ¶ 59. But neither the passage in Southern Blasting on which the
 majority relies nor the United States Supreme Court decision (FN8) cited
 as authority in that passage provide an explanation or even an affirmative
 statement that the phrase "direct and positive conflict" in the 1962
 amendment eliminates the "obstacle" prong of the actual conflict preemption
 standard. Thus, the majority eliminates one of the two means by which
 Wyeth may show actual conflict based on a single, unclearly-reasoned Fourth
 Circuit decision that is itself lacking in case law support. There is no
 basis for eliminating this prong of the actual conflict standard, and I
 disagree with the majority's conclusion to the contrary.(FN9) 
 
 ¶ 60. Assuming, then, that Wyeth may demonstrate actual conflict
 preemption by showing that state law is an obstacle to federal regulatory
 purposes and objectives, I believe the facts here support the conclusion
 that the state tort-law verdict in this case is preempted. The United
 States Supreme Court's decision in Geier v. American Honda Motor Co., 529
 U.S. 861 (2000), is controlling on the question of when state law poses an
 obstacle to federal purposes and objectives. In that case, the Department
 of Transportation had issued a safety standard that required automobile
 manufacturers "to equip some but not all of their 1987 vehicles with
 passive restraints." Id. at 864-65. Among the optional passive restraints
 were air bags. Honda was in compliance with this standard. Nonetheless,
 the plaintiff was seriously injured in a car accident while driving a 1987
 Honda that was not equipped with an air bag, but with another form of
 passive restraint. The plaintiff brought suit, alleging Honda was
 negligent in failing to install a driver's-side air bag in the car. Honda
 argued that the federal safety standard preempted the plaintiff's state-law
 negligence claim. The Supreme Court held that a lawsuit premising
 negligence on the failure to install an air bag conflicted with the
 objectives of the federal safety standard and was therefore preempted. Id.
 at 866.
 
 ¶ 61. In reaching this conclusion, the Court noted that the
 plaintiff and the dissenting opinion-like the majority in the instant
 case-viewed the federal regulation as setting a minimum safety standard
 that states were free to supplement or strengthen. Id. at 874. However,
 by examining the comments accompanying the regulation, the Court concluded
 that a safety standard allowing a choice of passive restraint systems while
 not mandating any particular system was a deliberate decision that
 reflected a balance of diverse policy concerns. See id. at 875 (noting
 that allowing mix of available safety devices available over time would
 "lower costs, overcome technical safety problems, encourage technological
 development, and win widespread consumer acceptance"). "In sum, . . . the
 1984 version of [the safety standard] embodies the Secretary's judgment
 that safety would best be promoted if manufacturers installed alternative
 protection systems in their fleets rather than one particular system in
 every car." Id. at 881 (quotations omitted). Accordingly, the Court
 concluded that the tort action sought to impose a duty on manufacturers to
 impose air bags, rather than other types of passive restraint systems, and
 that this state-law requirement was an obstacle to the federal objective of
 allowing a mix of safety devices.

 ¶ 62. Application of the Supreme Court precedent in Geier
 dictates the same result in this case. As with the DOT in Geier, the FDA
 is primarily concerned with public safety. The conclusion of what is best
 for public safety is arrived at by considering various policy factors that
 are sometimes in tension with one another. For example, in developing the
 safety regulation at issue in Geier, the DOT considered not only which
 passive-restraint systems were safest on an absolute scale, but which were
 most cost-effective and which would gain consumer acceptance. Similarly,
 here the FDA balances its assessment of a drug's safety against concerns
 for the drug's efficacy, taking into account that a safer but less
 effective drug is not necessarily best for the public health overall. See
 21 U.S.C. ¶ 355(d) (FDA must consider safety and efficacy); 21 U.S.C. ¶ 
 393(b)(1), (b)(2)(B) (FDA's mission is to protect public from unsafe drugs
 and to promote public health by approving regulated products in timely
 manner). In the specific context oarnings on drug labels, the FDA
 considers not only what information to include, but also what to exclude. 
 As the Eighth Circuit has noted in the medical device context, "[t]here are
 . . . a number of sound reasons why the FDA may prefer to limit warnings on
 product labels." See Brooks v. Howmedica, Inc., 273 F.3d 785, 796 (8th
 Cir. 2001). For example, "warnings about dangers with less basis in
 science or fewer hazards could take attention away from those that present
 confirmed, higher risks." Id.
 
 ¶ 63. No drug is without risks. The FDA balances the risks of a
 drug against its benefits to maximize the availability of beneficial
 treatments. The FDA's decision in approving a drug, its uses and labeling
 reflect consideration of these and other policy factors. While a
 state-court jury presumably shares the FDA's concern that drugs on the
 market be reasonably safe, the jury does not assess reasonableness in the
 context of public health and the associated risk-benefit analysis. A jury
 does not engage in a measured and multi-faceted policy analysis. Rather, a
 jury views the safety of the drug through the lens of a single patient who
 has already been catastrophically injured. Such an approach is virtually
 guaranteed to provide different conclusions in different courts about what
 is "reasonably safe" than the balancing approach taken by the FDA. In 
 act, different conclusions were reached in this case.

 ¶ 64. The jury in this case was instructed that "[a]
 prescription drug is unreasonably dangerous due to inadequate warnings or
 instructions if reasonable instructions regarding foreseeable risks of harm
 are not provided to the physician and other medical professionals who are
 in a position to reduce the risks of harm." Faced with plaintiff's tragic
 injuries, the jury concluded that allowing Phenergan to be delivered
 through IV administration was "unreasonably dangerous." The jury's verdict
 conflicts squarely with the FDA's assessment of precisely the same issue:
 whether Phenergan is safe and effective when delivered through IV
 administration. The claim is preempted.

 ¶ 65. For the above reasons, I dissent.


 _______________________________________
 Chief Justice

------------------------------------------------------------------------------
 Footnotes


FN1. The warning on the label that was in use in 2000 read in relevant
 part:

 INADVERTENT INTRA-ARTERIAL INJECTION: Due to the close
 proximity of arteries and veins in the areas most commonly
 used for intravenous injection, extreme care should be
 exercised to avoid perivascular extravasation or inadvertent
 intra-arterial injection. Reports compatible with
 inadvertent intra-arterial injection of [Phenergan], usually
 in conjunction with other drugs intended for intravenous use,
 suggest that pain, severe chemical irritation, severe spasm
 of distal vessels, and resultant gangrene requiring
 amputation are likely under such circumstances. Intravenous
 injection was intended in all the cases reported but
 perivascular extravasation or arterial placement of the
 needle is now suspect. There is no proven successful
 management of this condition after it occurs . . . . 

 When used intravenously [Phenergan] should be given in a
 concentration no greater than 25 mg per ml and at a rate not
 to exceed 25 mg per minute. WHEN ADMINISTERING ANY IRRITANT
 DRUG INTRAVENOUSLY IT IS USUALLY PREFERABLE TO INJECT IT
 THROUGH THE TUBING OF AN INTRAVENOUS INFUSION SET THAT IS
 KNOWN TO BE FUNCTIONING SATISFACTORILY. 

 (Emphasis added.) The revised warning the FDA failed to adopt read in
 relevant part:

 INADVERTENT INTRA-ARTERIAL INJECTION: There are reports of
 necrosis leading to gangrene, requiring amputation, following
 injection of [Phenergan], usually in conjunction with other
 drugs; the intravenous route was intended in these cases, but
 arterial or partial arterial placement of the needle is now
 suspect. . . . 

 There is no established treatment other than prevention: 

 1. Beware of the close proximity of arteries and veins
 at commonly used injection sites and consider the possibility
 of aberrant arteries. 

 2. When used intravenously, [Phenergan] should be given
 in a concentration no greater than 25 mg/ml and a rate not to
 exceed 25 mg/minute. INJECTION THROUGH A PROPERLY RUNNING
 INTRAVENOUS INFUSION MAY ENHANCE THE POSSIBILITY OF DETECTING
 ARTERIAL PLACEMENT. IN ADDITION, THIS RESULTS IN DELIVERY OF
 A LOWER CONCENTRATION OF ANY ARTERIOLAR IRRITANT. 

 (Emphasis added.)

FN2. The dissent appears to interpret any warning that would eliminate
 IV-push administration as inherently inconsistent with the FDA's approval
 of Phenergan for IV administration in general. We see no such
 inconsistency, as an approval of a drug for IV administration is not the
 same as a conclusion that all methods of IV administration are safe. In
 any case, a jury verdict in a failure-to-warn case simply establishes that
 the relevant warning was insufficient; it does not mandate a particular
 replacement warning. There may have been any number of ways for defendant
 to strengthen the Phenergan warning without completely eliminating IV-push
 administration. Our purpose in pointing out that the proposed warning the
 FDA rejected did not eliminate IV push is simply that rejecting this
 warning could not be seen as an affirmative effort by the FDA to preserve
 IV push as an option. 

FN3. We also reject defendant's argument that it would have been
 prosecuted for "misbranding" if it had strengthened the label without prior
 approval. See Witczak, 377 F. Supp. 2d at 731, 729 ("[T]he validity and
 authority of state law . . . does not depend on speculative hypotheticals"
 regarding "assumptions of what the FDA would have done" in response to a
 stronger warning.). 

FN4. The debate surrounding the amendment helps confirm that it was
 intended to preserve the right of states to regulate beyond the federal
 requirements of the FDCA. During the floor debate in the House, the
 subject of preemption arose several times. First, Congressman Smith of
 California expressed concern that the bill, as reported, contained "no
 language . . . which says anything to the effect that this particular
 measure will not preempt all State food and drug laws," and thus, might
 risk interfering with the efforts of some states to make their own,
 stricter regulations. 108 Cong. Rec. 21046 (1962) ("[I]t seems to me that
 if we are going to pass this law, someone ought to offer an amendment to
 make certain that the passage of this bill, which gives all of this power
 to the Department of Health, Education, and Welfare and the Food and Drug
 Administration, will not preempt any State laws"). Shortly thereafter,
 Congressman Harris of Arkansas, the primary House sponsor of the bill,
 offered his opinion that "there is nothing in this bill that in any way
 preempts the authority and prerogatives of the States." Id. at 21047. 
 Congressman Schenck of Ohio agreed, stating, "[m]any very helpful State
 laws are in effect; many such laws in some instances are even stronger than
 Federal laws for the protection of human health in the public interest." 
 Id. at 21056.

 Congressmen Schenck and Harris, despite insisting that the bill as written
 would not preempt stronger state laws, eventually supported the "direct and
 positive conflict" amendment, and Schenck reiterated that preemption should
 not apply in the "many instances where State laws in the area of food and
 drugs and health are even stronger than some of the Federal laws." Id. at
 21083. Neither the desirability of allowing states to regulate beyond the
 FDCA nor the intent of the amendment to protect such regulation from
 preemption was called into question during the debate.
 
FN5. The only alteration the new rule appears to make to ¶ 314.70 is that
 changes to the new "Highlights" section of a drug label may not be made
 without prior approval. 71 Fed. Reg. at 3934.

FN6. We also listed as an additional reason, not applicable here, that the
 third party whose liability was at issue in Plante was held liable under a
 different theory of liability that was not clearly within the scope of ¶
 1036. Id. at 273, 565 A.2d at 1348.

FN7. This is also the approach employed by the numerous federal district
 court decisions cited by the majority. Ante ¶ 14. Because I disagree with
 this analysis of the import of ¶ 314.70(c), I do not find these decisions
 to be persuasive. Instead, I side with the minority view expressed in
 Needleman, which concludes that ¶ 314.70(c) gives manufacturers very little
 latitude in unilaterally revising drug labels. Needleman v. Pfizer, Inc.,
 2004 WL 1773697, at *3 (N.D. Tex.).

FN8. See Hillsborough v. Automated Med. Labs., 471 U.S. 707, 713 (1985). 
 The cited passage in Hillsborough does not interpret the phrase "direct and
 positive conflict." It merely cites the different forms of preemption,
 including the "obstacle" prong. It is worth noting that the federal statute
 at issue in Geier v. American Honda Motor Co., 529 U.S. 861 (2000)
 (discussed below), contained an even broader savings clause than the 1962
 amendment to the FDCA. The provision in Geier stated simply that the
 federal safety standard at issue did "not exempt any person from any
 liability under common law." Id. at 868. 

FN9. Nonetheless, the Court concluded that all ordinary preemption
 principles-including actual conflict preemption and the obstacle prong of
 the standard-applied. The Court rejected the notion that Congress would so
 limit the effect of preemption as to allow an actual conflict with a
 federal objective: "Insofar as petitioners' argument would permit
 common-law actions that 'actually conflict' with federal regulations, it
 would take from those who would enforce a federal law the very ability to
 achieve the law's congressionally mandated objectives that the
 Constitution, through the operation of ordinary pre-emption principles,
 seeks to protect." Id. at 872.